UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SELLER AGENCY COUNCIL, INC., ) | | SA CV 06-679 AHS (MLGx) |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | | FINDINGS OF FACT AND |
| ) | | CONCLUSIONS OF LAW IN |
| KENNEDY CENTER FOR REAL ) | | SUPPORT OF JUDGMENT FOR |
| ESTATE EDUCATION, INC., ) | | DEFENDANTS AND COUNTER |
| et al., ) | | DEFENDANTS |
| ) | | |
| Defendants. ) | | |
| ) | | |
| AND RELATED COUNTERCLAIMS. ) | | |
| _____ ) | | |

Plaintiff Seller Agency Council, Inc. (hereinafter

"plaintiff" or "SAC") brought the instant action against Kennedy

Center for Real Estate Education, Inc. (hereinafter "KCREE") and

Joe Kennedy (hereinafter "Mr. Kennedy") (collectively

"defendants/counter-claimants") for breach of contract and a

declaration of trademark non-infringement.  Defendants/counter-

claimants assert a counter-claim for trademark infringement.

Trial was held before the Court on April 8, 9, 10, 2008 and June

24 and 25, 2008.  At the conclusion of trial, the Court took the

matter under submission.

After consideration of all exhibits and testimony, the Final Pretrial Conference Order, both parties' Proposed Findings of Fact and Conclusions of Law, and based on the parties' briefs and the Court's own research, the Court makes the following Findings of Fact and Conclusions of Law in support of judgment for defendants and counter defendants.

I.

**FINDINGS OF FACT**

**A.      Pre-contractual Negotiations**

1.   Mr. Kennedy, an individual residing in Georgia, and his company, KCREE, a Georgia corporation, created a valuable real estate seller agency designation program ("the ASR program") and developed several trademarks ("the ASR Trademarks") related thereto, and other intellectual property as more fully stated in paragraph 7(c) of the Final Pretrial Conference Order (collectively, "the intellectual property" or "IP").

2.   The ASR Trademarks include the following federal registrations:  3,071,769; 3,088,326; 3,093,851; 3,139,782; 3,325,443; and 3,240,837.

3.   In November 2003, Mr. Kennedy and KCREE began to market and earn income from the ASR program.

4.   By 2005, the program sales and revenues were trending upward when Stefan Swanepoel ("Mr. Swanepoel"), the owner and president of RealtyU, Inc. (hereinafter "RealtyU"), approached Mr. Kennedy about the possibility of RealtyU reaching an agreement with KCREE regarding the ASR program.

5.   Mr. Swanepoel presented the idea to Mr. Kennedy, in part, on the promise that Mr. Swanepoel and his company could

2

deliver a substantially greater number of students to Mr. Kennedy's ASR program (and therefore much greater income for Mr. Kennedy and KCREE) by virtue of the new company's access to the RealtyU affiliates across the country and the large number of students they could provide.

6.   On June 28, 2005, Mr. Swanepoel and Mr. Kennedy signed a "Letter Of Intent," which proposed that a new company be formed.  Eventually, the new company was created and incorporated in Nevada as SAC.

7.   The June 28, 2005 Letter of Intent set a target of 50,000 registered ASR students by 2010.  At that time (June 2005), KCREE had registered fewer than 1,000 ASR students.

8.   The June 28, 2005 Letter of Intent specified that other than teaching fees earned by Mr. Kennedy, all student course fees, provider licensing, and renewals would "be for the account of Newco" (the new company to be formed).

9.   On July 7, 2005, Mr. Swanepoel sent an e-mail to Mr. Kennedy proposing to execute a "stock purchase agreement," subsequently form the new company, and then to "formally close" the purchase at a date in the future.

10.   As part of the negotiations and discussions between Mr. Swanepoel and Mr. Kennedy, they discussed that the contract they were negotiating would call for a closing to be conducted after the contract was signed, at which time the transfer of rights between the parties would take place.

11.   From June 28 through early September, 2005, Mr. Swanepoel and Mr. Kennedy had numerous e-mail and telephone discussions about how to structure a deal between RealtyU and Mr.

1  Kennedy and KCREE.

2      12.   It was proposed by Mr. Swanepoel that RealtyU and

3  KCREE would own 51%-49%, respectively, in the new SAC company.

4      13.   On July 11, 2005, Mr. Kennedy e-mailed Mr.

5  Swanepoel and detailed some concerns that he had about the

6  proposed deal.  Among the concerns raised by Mr. Kennedy were the

7  following:  (a) the low initial value of the stock to be

8  transferred; (b) the new company's apparent ability to

9  subsequently transfer its assets to a third party; (c) the loss

10 of control of the IP once transferred to the new company; and (d)

11 Mr. Swanepoel's apparent control of everything upon execution of

12 the then-proposed agreement.

13     14.   On July 12, 2005, Mr. Swanepoel spoke with Mr.

14 Kennedy about his concerns and then the next day sent a reply e-

15 mail to Mr. Kennedy to address the concerns raised.  In this

16 reply e-mail, Mr. Swanepoel promised that:  (a) every year the

17 new company would distribute the profits of the company; and (b)

18 as "Chief Operating Officer" ("COO") of the new company, Mr.

19 Kennedy would have "control over the daily operations of the

20 company."

21     15.   On July 19, 2005, Mr. Kennedy sent another e-mail

22 to Mr. Swanepoel further expressing his concerns about KCREE's

23 vulnerability as a potential minority shareholder.

24     16.   On July 19, 2005, Mr. Swanepoel sent a reply e-

25 mail to Mr. Kennedy in which Mr. Swanepoel proposed that the

26 "Bylaws" of the new company would be written so "that the assets

27 of the company cannot be sold, nor the business proposition

28 changed, etc. without a 60% majority vote of the Shareholders.

1    That way [Mr. Kennedy would] have a type of veto right."

2         17.   To further address Mr. Kennedy's concerns about

3    minority protections, Mr. Swanepoel sent an e-mail on July 28,

4    2005, proposing that the 60% majority of shareholders' "veto

5    right" of Mr. Kennedy would be effective to prevent the company

6    from taking actions without Mr. Kennedy's approval to:  "i) alter

7    or change the rights, preferences or privileges of any

8    shareholder; ii) amend the Corporation's Articles of

9    Incorporation; or iii) liquidate or dissolve this corporation."

10        18.   Mr. Swanepoel's e-mail of July 28, 2005, also

11   proposed that the final agreement include a provision ensuring

12   the parties would take "all appropriate action to cause the

13   Corporation to perform and comply with each of the covenants and

14   agreements contained in this Agreement and to take the best

15   overall action for the corporation at all times."

16        19.   Some time in August of 2005, Mr. Swanepoel sent

17   another draft of the agreement for consideration and possible

18   execution by Mr. Kennedy.

19        20.   On August 29, 2005, Mr. Kennedy sent another e-

20   mail to Mr. Swanepoel expressing further concerns with the latest

21   proposed written agreement, including that:  (a) the proposed

22   agreement incorrectly referred to a "merger" of businesses; and

23   (b) "fees" should be turned over to the new company only after a

24   particular date.

25        21.   On September 1, 2005, Mr. Swanepoel replied by e-

26   mail and confirmed that the transaction proposed in the draft

27   agreement was to be the exchange of stock for assets, not a

28   merger, and that Mr. Kennedy was to be named COO of the new

1   company.

2         22.  Mr. Swanepoel's September 1, 2005 e-mail to Mr.

3   Kennedy also confirmed that the new company would not be entitled

4   to any "fees" until the "day we close and all conditions

5   stipulated in the agreement has [sic] been met."

6         23.  On September 2, 2005, Mr. Swanepoel e-mailed Mr.

7   Kennedy the final version of the stock purchase agreement for

8   review, along with two additional agreements the parties had

9   negotiated.  The September 2, 2005 e-mail from Mr. Swanepoel

10  indicated that once the agreement was signed, Mr. Swanepoel and

11  Mr. Bill Shue would:  (a) execute the agreement and send a copy

12  back to Mr. Kennedy; (b) proceed to incorporate the new company,

13  Seller Agency Council, in Nevada; (c) prepare a "closing

14  checklist"; and (d) prepare to issue share certificates, etc.

15  The e-mail indicated that Mr. Swanepoel thought they could "close

16  before the end of" September 2005.

17        24.  As a result of these negotiations, prior to

18  signing the three contracts in early September 2005, Mr. Kennedy

19  had been promised two important things by Mr. Swanepoel, namely:

20  (a) greater income as a result of more students going through the

21  course; and (b) adequate minority shareholder protections.

22        25.  The promised minority protections upon which Mr.

23  Kennedy and KCREE were relying included the promise (a) in the

24  Stock Purchase Agreement (§ 2.16) that Mr. Kennedy would see the

25  written Bylaws and Articles of Incorporation prior to closing;

26  (b) that certain protections would be written into the articles

27  and/or bylaws; (c) that Mr. Kennedy was to be employed as the COO

28  of SAC, so that he could keep the new company from taking actions

harmful to KCREE's interests as a minority shareholder; (d) that course fee revenue and renewal fee revenue generated from the program were to be strictly for the account of the new company only, not to RealtyU or KCREE; and, (e) the promise of proper operation of the new company to ensure its profitability and to guard against siphoning off monies to any other organization.

26.  By way of these pre-execution promises, Mr. Swanepoel convinced Mr. Kennedy to execute the agreements.  Mr. Kennedy signed agreements with SAC in September 2005 and he and his company promptly began to cooperate with RealtyU and/or SAC to market his ASR program.

**B.**      **The Agreements and Conduct of the Parties after Execution of the Agreements**

27.  On or about September 8, 2005, SAC and Mr. Kennedy and KCREE executed three agreements, namely the Stock Purchase Agreement, the Employment Agreement, and the Marketing Agreement.

28.  SAC performed in part under the Marketing Agreement by making all payments required under the Marketing agreement up and through June 30, 2006, and under the Employment Agreement by employing Mr. Kennedy as COO and reimbursing him for all expenses incurred therein.

29.  The Stock Purchase Agreement set out how and when SAC was to acquire KCREE's intellectual property.  The Stock Purchase Agreement did not specify that the parties were exchanging assets at the time of execution of the agreement and did not itself effect any transfer.  Instead, Paragraphs 1.1 and 1.2 of the Stock Purchase Agreement called for a subsequent closing within 30 days, at which time SAC was to acquire the

intellectual property from KCREE in exchange for 490,000 shares of stock.  But before the closing was to take place, SAC was required to meet certain conditions precedent.

30.  The Stock Purchase Agreement was executed on September 8, 2005, and the 30-day deadline for conducting a closing was October 8, 2005.

31.  No closing was conducted by October 8, 2005, and the closing called for in the Stock Purchase Agreement has not been conducted.

32.  Paragraph 2.16 of the Stock Purchase Agreement calls for plaintiff to deliver its corporate articles and bylaws to defendant prior to the closing.

33.  Plaintiff did not deliver its corporate articles and bylaws to defendants prior to October 8, 2005.

34.  Plaintiff first produced its corporate articles and bylaws to defendants in October of 2007 as an exhibit to its opposition to defendants' Motion for Sanctions.

35.  Prior to the filing of this lawsuit, plaintiff did not deliver any stock certificates to defendants/counter-claimants.

36.  Mr. Kennedy first saw copies of SAC stock certificates at his deposition in this suit on May 22, 2007.  The persons who executed the stock certificates have now admitted in affidavits that they did not actually execute the stock certificates on October 3, 2005, which would have been inside the 30-day closing period, but instead executed them at a later date outside the 30-day period.

37.  Paragraph 2.2 of the Stock Purchase Agreement

calls for SAC to "authorize" 1,000,000 shares of SAC stock.

38.   Prior to the filing of this action, SAC had not authorized 1,000,000 shares of SAC stock, and SAC has never authorized 1,000,000 shares of SAC stock.

39.   SAC has not authorized more than 75,000 shares of SAC stock.

40.   Paragraphs 1.1 and 2.2 of the Stock Purchase Agreement call for SAC to "issue" 490,000 shares of stock to KCREE and 510,000 shares of stock to RealtyU at the closing.

41.   Paragraphs 1.1 and 2.2 of the Stock Purchase Agreement call for SAC to "deliver" a stock certificate to KCREE representing 490,000 shares of stock at the closing.

42.   Paragraphs 1.1 and 1.2 of the Stock Purchase Agreement calls for SAC to "transfer" 490,000 shares of stock to KCREE at the closing in exchange for a Bill of Sale representing specified intellectual property assets of KCREE, including the ASR Trademarks.

43.   SAC did not issue, deliver, or transfer 490,000 shares of stock to KCREE prior to October 8, 2005, or at any time.

44.   SAC failed to "deliver" a stock certificate to KCREE representing 490,000 shares of stock by October 8, 2005, or at any time.

45.   No person or entity acting on behalf of KCREE acquired or took possession of any stock certificates from Plaintiff SAC.

46.   Paragraph 1.3 required SAC to take the best overall actions for the company.

47.   SAC did not take the best overall actions for the company, because, *inter alia*, it diverted substantially all, if not all, of the student course fees to RealtyU instead of to SAC.

48.   Paragraphs 1.1, 1.2, and 5.3 of the Stock Purchase Agreement call for KCREE to "deliver" a Bill of Sale to SAC at the closing in exchange for the delivery of the stock certificate representing 490,000 shares of stock in SAC.

49.   Paragraph 5.3 of the Stock Purchase Agreement calls for the Bill of Sale to be in a "mutually agreed" form.

50.   The Stock Purchase Agreement does not specify which party had the responsibility for preparing the Bill of Sale.

51.   Defendants/counter-claimants have not executed any assignment document or Bill of Sale to transfer any trademarks to the Plaintiff.

52.   Defendants/counter-claimants have not transferred or assigned any trademarks to SAC.

53.   Defendants/counter-claimants have not transferred or assigned legal title in or to any intellectual property to SAC.

54.   Despite the failure of SAC to comply with all the terms of the Stock Purchase Agreement, Mr. Kennedy remained hopeful that they could yet work it out.  Over the course of the next several months, Mr. Kennedy continued to work with SAC and RealtyU.  From time to time, Mr. Kennedy asked SAC about when they were going to conduct a closing and exchange stock for the intellectual property.  At each inquiry, he was told that for one reason or another SAC was not prepared to do so just yet.  The

first time he asked (not long after the 30-day closing window had expired), Mr. Kennedy was told that the stock certificates were not ready.  Over those same several months after executing the agreements, Mr. Kennedy met with SAC in California several times. At no time did anyone at SAC indicate that the stock certificates were ready or otherwise indicate that SAC was ready to close the deal.

55.  Eventually, Mr. Kennedy discovered that, although he had the title of COO, he did not have the power that attends such a position.  Instead, important decisions were being made without his approval or input.  He had no access to any financial data for the new company.  He also learned that a significant stream of ASR program revenue was being diverted to RealtyU (to benefit Stefan Swanepoel and other RealtyU owners), instead of flowing to SAC.

56.  Mr. Kennedy stopped working with SAC and RealtyU. By way of a demand letter from counsel, he demanded that SAC stop using his program and trademarks.  The July 12, 2006 demand letter also informed SAC that it had no rights in the trademarks under the contract.

57.  The trademarks being used by SAC are identical to the ASR Trademarks registered by KCREE.

58.  From September 8, 2005, until July 12, 2006, defendants/counter-claimants were aware that SAC was using the ASR trademarks and did not object to such use.  It is undisputed that for that period of time, SAC had permission or an implied license to use the ASR Trademarks.

59.  SAC's permission to use the ASR trademarks after

July 12, 2006 is disputed.  However, after the July 12, 2006
letter was received by SAC - and as late as November 2007, well
after the commencement of this action - Mr. Kennedy continued to
ask SAC to make use of the intellectual property by requesting
that it process certificates and certify members in the ASR
program for classes.  In addition, Mr. Kennedy continued to
forward student information to SAC to be included in SAC's
"website system" during this time period.  This conduct was
consistent with Mr. Kennedy's conduct prior to the July 12, 2006
cease and desist letter and inconsistent with the demand set
forth in the letter.

**II.**

**CONCLUSIONS OF LAW**

1.  Generally, the contracts at issue in this dispute
are subject to interpretation under California law.  However, the
internal affairs of SAC, including what constitutes "issuance"
and "delivery" of stock shares, is a matter of Nevada law, since
SAC is incorporated in Nevada.

2.  The issues in this case are largely tied to the
Court's determination of who owns the intellectual property at
issue.  That question turns on the Court's interpretation the
Stock Purchase Agreement.  Generally speaking, the interpretation
of a contract is a legal question for the Court.  See Kern Oil &
Refining Co. v. Tenneco Oil Co., 792 F.2d 1380, 1383 (9th Cir.
1986), cert. denied, 480 U.S. 906 (1987).

3.  The language of a contract is to govern its
interpretation, if the language is clear and explicit, and does
not involve an absurdity.  See Cal. Civ. Code § 1638.  When a

contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible.  <u>See</u> Cal. Civ. Code § 1639; <u>see also</u> <u>Falkowski v. Imation Corp.</u>, 132 Cal. App. 4th 499, 505-506 (2005).  Contractual interpretation turns on "what was intended by what was said — not what a party intended to say."  <u>Falkowski</u>, 132 Cal. App. 4th at 505-506 (2005).  Thus, a contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.  <u>See</u> Cal. Civ. Code § 1643.

4.   Under California law, a contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.  <u>See</u> Cal. Civ. Code § 1636.  When faced with a dispute over the meaning of a contractual provision, a court must first determine whether the provision is ambiguous, i.e., whether, on its face, the language of the provision is capable of different, yet reasonable interpretations.  <u>Falkowski</u>, 132 Cal. App. 4th at 505-506.

5.   If an ambiguity is found, the court must determine which of the plausible meanings the parties actually intended.  <u>Id.</u>  For the purpose of ascertaining the parties' intention, if otherwise doubtful, the rules given in Cal. Civ. Code §§ 1635-1663 are to be applied.  <u>See</u> Cal. Civ. Code § 1637.

6.   Therefore, if the parties offer no extrinsic evidence concerning the meaning of the contractual language, or when extrinsic evidence is offered but not in conflict, ascertaining the intended meaning is solely the duty of the

Court.  <u>See</u> <u>Falkowski</u>, 132 Cal. App. 4th at 505-506.

7.   The language of the contract at issue here is clear and not ambiguous according to its express terms.  The Stock Purchase Agreement sets forth specific terms and conditions that guide and control the conduct of the parties to the contract, including the purchase of SAC stock and the transfer of intellectual property assets owned by KCREE.  The parties do not appear to differ substantially about the meaning of the terms of the contract, but instead disagree about whether the intellectual property of KCREE has been transferred to SAC.

8.   Generally, the words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.  <u>See</u> Cal. Civ. Code § 1644.  Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.  <u>See</u> Cal. Civ. Code § 1645.

9.   In evaluating the contractual language, courts also "take into account all the facts, circumstances and conditions surrounding the execution of the contract." <u>Falkowski</u>, 132 Cal. App. 4th at 505-506.

10.   The Stock Purchase Agreement refers to the parties conducting a "closing" after executing the agreement.  The Stock Purchase Agreement also refers to "delivery" of stock certificates and "delivery" of a Bill of Sale.  Regardless of whether an ordinary or technical definition is applied to the

1    terms "closing" and "delivery," the result is the same.

2        11.  Both plaintiff and Mr. Kennedy are real estate

3    professionals and, therefore, often deal with "closings" and know

4    that a closing is generally a final meeting between the parties,

5    at which the transaction is consummated through the exchange of

6    consideration.

7        12.  It is widely understood that a stock certificate

8    is not "issued" until it passes from the custody of the issuer

9    into the possession of a bearer or an agent of the bearer.

10   Modern Securities Transfers, § 10.01[1] (2001).  In fact, the

11   essential element of a transfer of a stock certificate is the

12   "delivery" of the certificate to the bearer.  Id. at § 5.01.

13   Nevada Law explicitly states that "delivery" is defined as the

14   "voluntary transfer of possession."  See Nev. Rev. Stat. Ann. §

15   104.1201(o).  Furthermore, delivery — and therefore issuance — of

16   a certified security (such as a stock certificate) to a purchaser

17   occurs when:

18            (a)  The purchaser acquires possession of the security

19                 certificate;

20            (b)  Another person, other than a securities

21                 intermediary, acquires possession of the security

22                 certificate on behalf of the purchaser or, having

23                 previously acquired possession of the certificate,

24                 acknowledges that it holds for the purchaser; or

25            (c)  A securities intermediary acting on behalf of the

26                 purchaser acquires possession of the security

27                 certificate, only if the certificate is in

28                 registered form and it registered in the name of

the purchaser, payable to the order of the

purchaser, or specially endorsed to the purchaser

by an effective endorsement and has not been

endorsed to the securities intermediary or in

blank.

See Nev. Rev. Stat. Ann. § 104.8301.

13.   The Stock Purchase Agreement explicitly called for the delivery of the stock certificate by plaintiff to KCREE. Plaintiff did not physically deliver any stock certificate to KCREE, nor did any entity acting on behalf of KCREE acquire possession of the stock certificates from SAC.

14.   The fact that plaintiff claims to have prepared a stock certificate is not sufficient to meet the standard for delivery (using either an ordinary or technical definition). Mere preparation for physical delivery does not constitute legal delivery.  See, e.g., Kaufman v. Diversified Indus., Inc., 460 F.2d 1331, 1334-35 (2nd Cir.), cert. denied, 409 U.S. 1038 (1972); Securities & Exchange Comm. v. John E. Samuel & Co., Fed. Sec. L. Rep. para. 93,720, at 93, 197 (S.D.N.Y. 1973) ("[N]othing less than physical delivery to the purchaser or his agent will complete the exchange of securities and thereby vest title in the purchaser.").

15.   Neither does the allegation by plaintiff that the Board of Directors authorized the issuance of 36,750 shares of stock to KCREE affect delivery; the mere instruction by the issuer to issue stock certificates does not amount to delivery. See Kaufman, 460 F.2d at 1334-35.

16.   SAC did not deliver any share certificates to

16

KCREE and, without delivery, KCREE does not have legal title in and to any SAC share certificates.

17.  The unambiguous language of the Stock Purchase Agreement required that several conditions precedent be met before SAC could acquire title to the specified intellectual property assets owned by KCREE.  This proposed exchange of stock for intellectual property was predicated on the completion and/or observance of the following terms and conditions found in the Stock Purchase Agreement:

      a.  Within 30 days from the execution of the Stock Purchase Agreement, a closing was required to take place. (§1.1, §1.2)

      b.  Plaintiff was required to be incorporated as a Nevada corporation prior to closing (within 30 days) (§2.1);

      c.  Plaintiff was required to deliver the Articles and Bylaws of SAC to KCREE prior to conducting a closing. (§2.16)

      d.  At all times Plaintiff was required to take the best overall actions for SAC. (§1.3)

      e.  Plaintiff was required to authorize the issuance of 1,000,000 shares of stock prior to the closing. (§2.2)

      f.  At the closing, plaintiff was required to issue 490,000 shares of stock to KCREE and 510,000 shares of stock to RealtyU. (§1.1, §2.2 )

      g.  At the closing, plaintiff was required to

1                   deliver to KCREE a duly executed stock

2                   certificate representing the 490,000 shares

3                   of stock. (§1.1, §1.2)

4           h.   At the closing, KCREE was required to deliver

5                   a mutually agreeable Bill of Sale that

6                   legally transferred all rights, title and

7                   interest to the intellectual property assets

8                   to Plaintiff in exchange for the stock

9                   certificate representing the 490,000 shares

10                  of stock. (§1.1, §1.2, §5.3)

11    18.  Of the foregoing express conditions, only the

12 second item has been satisfied.  Therefore, under the Court's

13 interpretation of the Stock Purchase Agreement and in light of

14 the Court's findings of fact, the Court concludes that by

15 operation of the Stock Purchase Agreement and the conduct of the

16 parties in relation thereto, there has been no transfer of

17 intellectual property rights from KCREE to SAC.

18    19.  In addition, plaintiff has unclean hands.  (See ¶

19 47.)  California law prohibits a party from taking advantage of

20 his own wrong.  Cal. Civ. Code § 3517 (2007).  Thus, a claimant

21 must "act fairly in the matter for which he seeks a remedy.  He

22 must come into court with clean hands, and keep them clean, or he

23 will be denied relief, regardless of the merits of his claim."

24 Kendall-Jackson Winery, Ltd. v. Superior Court of Stanislaus

25 County, 76 Cal. App. 4th 970, 978 (1999).  Generally, California

26 courts look to the nature of the misconduct and the relationship

27 of the misconduct to the claimed injuries to determine if the

28 doctrine of unclean hands bars recovery.  Blain v. Doctor's Co.,

222 Cal. App. 3d 1048, 1060 (1990).  (The nature of the misconduct need not be a crime or a tort, but "[a]ny conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine."  <u>Id.</u> at 979.  However, "[t]he misconduct must 'prejudicially affect . . . the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief.'"  <u>Id.</u> (quoting <u>Mattco Forge, Inc. v. Arthur Young & Co.</u>, 52 Cal. App. 4th 820, 846 (1997))).

> 20.  Plaintiff has failed to perform in equity and therefore the plaintiff is barred from seeking specific performance under the Stock Purchase Agreement due to SAC's unclean hands.

> 21.  Having concluded that under the Stock Purchase Agreement that KCREE remains the owner of the intellectual property at issue, the Court next turns to the question of whether the conduct of the parties gives SAC any power or right to obtain the intellectual property of KCREE other than through conducting a closing prior to July 12, 2006 (the date of the demand letter) and in the manner as stated in the contract.  The Court concludes that the Stock Purchase Agreement exclusively controls the rights of SAC to obtain rights in the intellectual property, inasmuch as it includes an "Entire Agreements" provision (§ 8.9, barring the parties from being bound by items outside the contract) and an "Amendments" provision (§ 8.7, barring amendment of the contract other than by written agreement or by express permission of the other party).

> 22.  The agreement has not been modified in a writing

signed by both parties, nor has SAC specifically requested and
received a waiver of any provisions of the contract from KCREE.
As such, the Court concludes that SAC's only mechanism for
obtaining rights in the intellectual property was through the
specific provisions of the contract.

        23.   Inasmuch as KCREE was the owner of the ASR
Trademarks and certain copyrights before the execution of the
Stock Purchase Agreement and the Stock Purchase Agreement and/or
subsequent modifications to the Agreement have not caused any
transfer thereof, the Court concludes that KCREE is still the
owner of the ASR Trademarks and copyrights.

        24.   All parties in the present action have stipulated
that the conduct/actions of the plaintiff/counter defendants
constitute trademark infringement if the KCREE is found to be the
rightful owner of the intellectual property assets at issue (and
if the plaintiff/counter-defendants are not found to have some
rights to use the marks after July 12, 2006).  As set forth
above, the Court has concluded that KCREE has been the rightful
owner throughout this controversy, and continues to be the owner
of such intellectual property assets.

        25.   Any right or permission of plaintiff/counter
defendants to use the trademarks of KCREE end upon entry of
judgment.  The parties stipulated that use of the intellectual
property at issue by SAC would constitute trademark infringement
unless SAC had a right to use the intellectual property after
July 12, 2006 by "ownership, license or permission (whether
implied or expressed)." (See Final Pretrial Conference Order, at
4).  Though the Court finds KCREE owns the intellectual property

at issue, it finds defendants'/counter-claimants' conduct after they sent the July 12, 2006 demand letter led plaintiff/counter-defendants to believe that they continued to have "permission" to use the trademarks.  Defendants/counter-claimants therefore may not recover damages or royalties from counter-defendants in light of their acquiescence to their use of the trademarks even after demanding that cessation and plaintiff's/counter defendants' initiation of this litigation.  <u>See</u> 15 U.S.C. § 1115(b)(9); <u>ProFitness Physical Therapy Center v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.</u>, 314 F.3d 62, 67 (2d Cir. 2002) (setting forth the elements of acquiescence).

26.  Under the Lanham Act, the prevailing trademark owner is entitled to an award of damages and an injunction.  <u>See</u> 15 U.S.C. § 1117.  Because the Court finds that plaintiff's/counter defendants' use of the intellectual property, including use past the commencement of this litigation, was with defendants'/counter-claimants' consent and acquiescence, an award of damages or royalties is not appropriate.

27.  The Court finds that a permanent injunction is appropriate.  Inasmuch as the counter-defendants have been put on notice of the infringement since trial, the Court concludes that the counter defendants have had time to prepare for a transition to not using the trademarks.  Accordingly, the Court enjoins the counter-defendants against infringing or otherwise making use of counter-claimants' intellectual property from the entry of judgment.

28.  Because the Court finds plaintiff/counter defendants had permission to use the trademarks both prior to and

following defendant's cessation letter, attorney's fees based on trademark infringement are not warranted.

### III.

### CONCLUSION

For the foregoing reasons, the Court finds in favor of defendants on the Complaint and in favor of counter defendants on the Counterclaim.

The Clerk shall serve the Court's Findings of Fact and Conclusions of Law on all counsel of record for all parties in this action.  The Clerk shall enter judgment as above stated. Each party shall bear its own costs.

Dated:  September  29 , 2008.

ALICEMARIE H. STOTLER

_____

Alicemarie H. Stotler
Chief U.S. District Judge