UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SELLER AGENCY COUNCIL, INC., | ) | SA CV 06-679 AHS (MLGx) |
| Plaintiff, | ) | |
| v. | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW ON THE |
| KENNEDY CENTER FOR REAL | ) | ISSUE OF ACQUIESCENCE |
| ESTATE EDUCATION, INC., | ) | |
| et al., | ) | |
| Defendants. | ) | |
| | ) | |
| AND RELATED COUNTERCLAIMS. | ) | |

**I.**

**BACKGROUND**

Plaintiff Seller Agency Council, Inc. ("plaintiff" or
"SAC") brought the instant action against Kennedy Center for Real
Estate Education, Inc. ("KCREE") and Joe Kennedy ("Mr. Kennedy")
(collectively, "defendants/counter-claimants") for breach of
contract and a declaration of trademark non-infringement.
Defendants/counter-claimants brought a counterclaim for trademark
infringement against SAC, RealtyU Group, Inc. ("RealtyU"), and
Stephan Swanepoel ("Mr. Swanepoel") (collectively,

"plaintiff/counter-defendants"). On September 29, 2008, after a
court trial ending in June 2008, the Court issued findings of
fact and conclusions of law in support of judgment for defendants
and counter-defendants. (Doc. No. 111.) The Court found that no
transfer of intellectual property rights from KCREE to SAC had
been effected. (Id. at ¶ 18.) The Court also found that SAC had
unclean hands, and thus could not seek specific performance of
the parties' Stock Purchase Agreement. (Id. at ¶¶ 19-20.)

Before trial, the parties stipulated that the
plaintiff/counter-defendants' actions would constitute trademark
infringement if KCREE was found to be the rightful owner of the
intellectual property, and if plaintiff/counter-defendants were
not found to have some right to use the marks after July 12,
2006, the date of KCREE's cease and desist letter to Mr.
Swanepoel and RealtyU. (Id. at ¶ 24.) The Court found that
defendants/counter-claimants' conduct after the cease and desist
letter led plaintiff/counter-defendants to believe they had
permission to use the trademarks, but such consent ended upon
entry of judgment and the Court's issuance of a permanent
injunction. (Id. at ¶ 25.) Because plaintiff/counter-
defendants' use of the trademarks was found to be with
defendants/counter-claimants' "consent and acquiescence," the
Court declined to award damages. (Id. at ¶ 26.)

On defendants/counter-claimants' appeal, the Court of
Appeals for the Ninth Circuit noted that it had only "dealt in
passing with the concept of acquiescence to infringement," and it
had not "articulated a definition or established a practical test
for district courts to apply." Seller Agency Council, Inc. v.

2

1   Kennedy Center for Real Estate Edu., Inc., 621 F.3d 981, 988 (9th
2   Cir. 2010).   After reviewing relevant case law, the Ninth Circuit
3   held that "[t]he elements of a *prima facie* case for acquiescence
4   are as follows:  (1) the senior user actively represents that it
5   would not assert a right or a claim; (2) the delay between the
6   active representation and assertion of the right or claim was not
7   excusable; and (3) the delay caused the defendant undue
8   prejudice."  Id. at 989.

9        The Ninth Circuit vacated the judgment and remanded
10  with instructions for the Court to consider "the scope of
11  [defendants/counter-claimants'] active representations [and] the
12  extent and reasonableness of [plaintiff/counter-defendants']
13  reliance on those representations."  Id. at 990.  In particular,
14  the Ninth Circuit noted that the Court did not make findings
15  whether defendants/counter-claimants' requests that
16  plaintiff/counter-defendants use the marks for a specific purpose
17  after the July 12, 2006 demand letter "amounted to a *carte*
18  *blanche* to use the marks for any other purposes, whether and to
19  what extent the marks actually were used for other purposes, or
20  whether it was reasonable in light of the cease-and-desist letter
21  and subsequent litigation for [plaintiff/counter-defendants] to
22  use the marks either for purposes of the specific requests or for
23  purposes outside of [sic] scope of those requests."  Id.

24       Following a post-remand status conference on December
25  10, 2010, on January 10, 2011, the parties filed concurrent Phase
26  One[1] opening briefs on acquiescence, followed by concurrent reply

27  _____

28       [1]  The issue of damages was bifurcated to Phase Two.

briefs on January 31, 2011.  Upon the filing of the reply briefs, the Court took the matter under submission.

After consideration of the parties' post-remand briefing, as well as all trial exhibits and testimony, the Final Pretrial Conference Order, both parties' current and previous proposed Findings of Fact and Conclusions of Law, and the Court's own research, the Court makes the following Findings of Fact and Conclusions of Law, finding no acquiescence by defendants/counter-claimants.  Pursuant to the Court of Appeals' remand, the Court's findings of fact only pertain to the limited issue of whether defendants/counter-claimants acquiesced to plaintiff/counter-defendants' use of KCREE's trademarks following the July 12, 2006 cease and desist letter.

## II.

### FINDINGS OF FACT

A.       **The Parties**

1.   Defendant/counter-claimant Mr. Kennedy, an individual residing in Georgia, is the sole officer, director and shareholder of KCREE.  KCREE owns an educational curriculum called the Accredited Seller Representative program (the "ASR program"), along with several trademarks (the "ASR trademarks") and copyrighted materials related thereto.  The ASR trademarks include the following federal registrations:  3,071,769; 3,088,326; 3,093,851; 3,139,782; 3,325,443; and 3,240,837.

2.   Plaintiff/counter-defendant SAC is a Nevada Corporation.  Counter-defendant Mr. Swanepoel, an individual residing in California, was president of counter-defendant RealtyU at all relevant times.

3.    In September 2005, Mr. Kennedy and Mr. Swanepoel executed a stock purchase agreement pursuant to which SAC was to own the ASR program and trademarks upon closing.   Although the closing never occurred, SAC, RealtyU, and Mr. Swanepoel had permission and consent to use the ASR trademarks between September 8, 2005 and July 12, 2006.

**B.        July 12, 2006 Demand Letter and Mr. Kennedy's Requests**

4.    On July 12, 2006, through counsel, Mr. Kennedy and KCREE sent a cease and desist letter to Mr. Swanepoel.   The letter asserted that "In light of the fact that your companies [SAC and RealtyU] do not have a contract with our clients, your continued use of our clients' trademarks constitutes trademark infringement.   Unless we can reach an accommodation with you, please halt all use of our clients' trademarks." (Doc. 150-1, Excerpts of Record ("ER") 29.) As a solution to the alleged trademark infringement, the letter proposed an arrangement whereby Mr. Kennedy would sell all of his intellectual property rights to Mr. Swanepoel, with the exception of the territory of Georgia.

5.    Following receipt of the demand letter, Mr. Swanepoel and Mr. Kennedy had a conversation wherein Mr. Kennedy expressed that he no longer wanted to work with Mr. Swanepoel and Mr. William Shue.   During that conversation, Mr. Kennedy initially accepted an invitation to come to California to resolve any outstanding issues.   However, Mr. Kennedy changed his mind a few days later and no further discussions took place.

6.    On July 25, 2006, SAC filed a complaint for breach of contract and declaratory relief to determine whether it

owned the ASR trademarks.[2]  On February 2, 2007, Mr. Kennedy and KCREE answered and filed counterclaims for trademark infringement, unfair and deceptive trade practices, unfair competition, and copyright infringement.

7.   When the litigation began, the database of ASR designees was in SAC's physical possession.  During this time, defendants/counter-claimants could not access the database, nor did they have control over plaintiff/counter-defendants' use of the ASR trademarks.

8.   During the litigation, Mr. Kennedy continued to teach ASR courses and generate income from the ASR program. Rather than fracturing the master ASR database, Mr. Kennedy sought to have it remain complete.  In an attempt to keep the master database whole while it was in SAC's possession, Mr. Kennedy made certain administrative requests to plaintiff/counter-defendants regarding the use of his ASR intellectual property.

9.   On several occasions after the July 12, 2006 demand letter, as early as July 28, 2006 and as late as November 19, 2007, Mr. Kennedy asked plaintiff/counter-defendants to make use of his ASR intellectual property as follows:

   •   On July 28, 2006, Mr. Kennedy sent an email to
       Cheryl Favreau, a potential student who was unable

----

[2]  The next day, on July 26, 2006, KCREE filed a trademark infringement action against SAC, RealtyU, and Barney Fletcher Enterprises, Inc. in the Northern District of Georgia. (Docket No. 1:06-cv-01744-TWT.)  The complaint was dismissed on April 6, 2007, for failure to effectuate service of process within 120 days.  Judgment dismissing the case was entered on April 9, 2007.

to sign up for the ASR course online, with a
carbon copy to Tom Mitchell ("Mr. Mitchell") of
RealtyU.  Mr. Kennedy indicated that he was
"forwarding this to our IT folks.  Hopefully they
can get you going."  (ER 26.)

- On or about July 25, 2006, Mr. Kennedy sent a
  hand-written request to Mr. Mitchell regarding
  eleven students recently taught by Mr. Kennedy.[3]
  The request states that, "These are a direct
  result of me so no per student fee is due.  These
  need to go into the system ASAP.  In the interim,
  they are being added to my data base as well.
  Call me if you have questions."  (ER 54.)

- On or about July 25, 2006, Mr. Kennedy also sent a
  hand-written note to Anita Eree regarding five
  student designee applications, requesting
  "directory changes and sen[d] pen [sic]
  certificates, ASAP."  (ER 55.)

- Sometime during December 2006,[4] Mr. Kennedy sent
  another hand-written note to Ms. Eree regarding
  nine student applications.  The note states, "Here
  are the apps from the December class."  Mr.
  Kennedy signed the note with a smiley face and

---

[3]  The document appears to have been stamped on
September 1, 2006, perhaps indicating the request was processed
on this date.

[4]  The document appears to have been stamped on January
2, 2007, perhaps indicating the request was processed on this
date.

also wrote "Happy new year." (ER 44.)

- Sometime during late January 2007,[5] Mr. Kennedy sent another request regarding sixty-seven students to Mr. Mitchell and Ms. Eree, "Re: Candidate Apps Blanchard Calhoun." The request states, "These are from my January 13th/17th Class Augusta, GA." (ER 67.)

- On or around November 19, 2007, Mr. Kennedy sent a final request to Mr. Mitchell regarding twelve student applications. The request states, "From Kennedy Center to be placed in data base. Hope you and your family have a <u>Great</u> Thanksgiving." (ER 31.)

10.  Plaintiff/counter-defendants complied with Mr. Kennedy's requests to process additional student names by adding them to the database and sending out pins and certificates.

11.  In his requests to SAC to add a total of approximately 92 student names to the database, Mr. Kennedy did not intimate that he planned to release his trademark infringement claim against plaintiff/counter-defendants.

12.  Through his actions in forwarding student names to SAC for inclusion in the master database, Mr. Kennedy sought to avoid customer dissatisfaction by ensuring a seamless student experience, one that was unaffected by the parties' ongoing business dispute. By not publicizing the dispute to students,

---

[5] The document appears to have been stamped on January 2007, with the handwritten day of "31" written over the stamped portion.

and maintaining the appearance that the program was running smoothly, Mr. Kennedy hoped to minimize any injury to the ASR program or its designees until the litigation was resolved.

13.   Mr. Kennedy testified at trial that "the bottom line is they [customers] expected the service.  Until we got this issue resolved, there was no sense in upsetting the applecart in my way of thinking." (RT 06/24/08 204:15-17.)  He goes on to say that, "I did not want them [students] to be aware that there was a – well, a federal lawsuit filed against me.  Okay?  And the ASR designation program and such so as to actually diminish the value of the entire program for all of our benefits." (RT 06/24/08 209:8-13.)

14.   Mr. Kennedy's students were his top priority, explaining that they "are the ones I care the most about, yes. Because they're the ones – they're the ones that had paid us – okay?  To offer a service so that's my ultimate concern is our students, yes." (RT 06/24/08 209:21-24.)  The ASR students "actually paid good money; they deserved to get the services and so, you know, this was the deal between us as far as the litigation, the lawsuit that they filed; and I was in hopes that we would ultimately resolve it without it ever seemingly there being a problem to our members.  That's why.  It would have been confusing to create another Council and all of that kind of good stuff." (RT 06/25/08 66:21-25, 67:1-3.)

15.   During litigation, Mr. Kennedy forwarded his student names to SAC in good faith in order to avoid creating problems for the students and causing irreparable damage to the program, which would hurt all the parties involved.  (RT 06/25/08

66:10-20.)

16. Following the demand letter, Mr. Kennedy's conduct changed with respect to SAC. Instead of jointly promoting the ASR program in conjunction with SAC, Mr. Kennedy resumed teaching courses only for the benefit of KCREE. In addition, instead of having the $65 student fee paid to SAC, after the demand letter, Mr. Kennedy began retaining the $65 fee for each student he taught, for the benefit of himself and KCREE. (RT 06/24/08 202:10-24.)

**C.      SAC Database and SAC's Use of the ASR Trademarks**

17. As of December 2005, when KCREE forwarded the student database to SAC, there were 938 students' names in the database, representing students that KCREE previously registered under the ASR designation. (RT 06/25/08 102:5-7; Deft. Tr. Ex. 191.) Upon the formation of SAC, RealtyU transferred approximately 65-85 members into the database. (RT 04/10/08 36:18-25.) From 2006-2007, Mr. Kennedy taught an additional 250-300 students. (RT 04/10/08 34:14-23.) In 2006, RealtyU provided approximately 900 members to SAC. (RT 04/10/08 37:3-8.) In 2007, RealtyU provided approximately 900 to 1,000 members to SAC. (RT 04/10/08 37:10-16.) In addition to the students taught by Mr. Kennedy and RealtyU, independent affiliates supplied approximately 300 additional members. (RT 04/10/08 38:1-3.)

18. Although Mr. Kennedy, RealtyU, and independent affiliates provided a cumulative total of over 3,500 names to the master SAC database from 2006-2007, as of April 2008, the number of active members in the database dropped to approximately 1,800 //

1   to 2,000, due to attrition and collection difficulties.[6]  (RT

2   04/10/08 36:10-17, 38:3-18; RT 06/25/08 101:11-21.)

3         19.   Before July 12, 2006, among other things,

4   plaintiff/counter-defendants marketed, published and licensed the

5   ASR course for schools to teach, collected fees related thereto,

6   represented to the public through press releases, personal

7   announcements, and license agreements that they owned the ASR

8   course and trademarks, maintained a membership database website

9   for ASR designees and candidates to advertise their ASR status,

10  taught the ASR course online, owned and maintained related

11  website URLs, tracked and collected student and member progress

12  and dues, issued certificates and pins to members, collected

13  membership fees, and handled customer - both student and teacher

14  - problems with the ASR program.

15        20.  Plaintiff/counter-defendants' use of the

16  trademarks after July 12, 2006, did not differ from their use

17  prior to July 12, 2006.

18        21.  After the cease and desist letter, Mr. Kennedy

19  made no requests with respect to plaintiff/counter-defendants'

20  marketing the ASR program.  Mr. Kennedy's requests to keep the

21  database whole were made in order to benefit Mr. Kennedy and/or

22  KCREE, and to protect existing and future ASR designees.

23  //

24  //

25

26        [6]  Defendants' Trial Exhibit 190 shows a total of 6,315
    ASR members, but this number is overstated because it includes a
27  number of duplicate registrations.  Defendants' proposed findings
    of fact #62-63 indicate that there may have been 2,463 active
28  students as of March 2008, but the Court has insufficient data
    before it to adopt this figure.

1

**III.**

2

<u>CONCLUSIONS OF LAW</u>

3      1.   In <u>Seller Agency Council</u>, 621 F.3d at 989, the

4   Court of Appeals adopted the test for acquiescence used in the

5   Eleventh and Second Circuits.   <u>See</u> <u>Coach House Rest. v. Coach and</u>

6   <u>Six Rests., Inc.</u>, 934 F.2d 1551, 1558 (11th Cir. 1991);

7   <u>ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports</u>

8   <u>Physical Therapy P.C.</u>, 314 F.3d 62, 67 (2d Cir. 2002).   Under

9   this test, to demonstrate a *prima facie* case of acquiescence, a

10  defendant must show:

11      (1) The senior user actively represents that it would

12  not assert a right or a claim;

13      (2) The delay between the active representation and

14  assertion of the right or claim was not excusable; and,

15      (3) The delay caused the defendant undue prejudice.

16  <u>Seller Agency Council</u>, 621 F.3d at 989.

17      2.   In addition to setting forth a practical test that

18  district courts may follow, noting the factual difficulties in

19  this case, the Court of Appeals instructed that, "the proper

20  inquiry is whether and to what extent [plaintiff/counter-

21  defendants] relied reasonably on [defendants/counter-claimants']

22  active representations that [plaintiff/counter-defendants] had a

23  right to use the marks."   <u>Id.</u> at 991.

24      3.   The doctrine of acquiescence turns on "'a

25  consideration of the circumstances of each particular case and a

26  balancing of the interests and equities of the parties.'"

27  <u>ProFitness</u>, 314 F.3d at 67 (quoting <u>Carl Zeiss Stiftung v. VEB</u>

28  <u>Carl Zeiss Jena</u>, 433 F.2d 686, 703 (2d Cir. 1970)).

**A.**          **Active Representations**

4.    Acquiescence "limits a party's right to bring suit following an affirmative act by word or deed by the party that conveys implied consent to another." <u>Seller Agency</u>, 621 F.3d at 988 (citing 6 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, § 31:42 (4th ed. 2008)).

5.    "Active consent is implied by conduct on the plaintiff's part that amounts to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant." <u>ProFitness</u>, 314 F.3d at 68 (internal quotation marks and alteration omitted).

6.    Typically, any acts "after receiving a cease and desist letter are at the defendant's own risk because it is on notice of plaintiff's objections to such acts." <u>Id.</u> at 68 (internal quotation marks omitted).  However, the effects of a cease and desist letter may be ameliorated by a good faith response that a plaintiff subsequently ignores.  <u>Id.</u>

7.    As discussed above, defendants/counter-claimants made certain requests to plaintiff/counter-defendants regarding the processing of student names, both after the cease and desist letter was sent, and after the instant trademark infringement complaint and counterclaims were filed.  Given the ministerial nature of these requests, combined with the fact that the ASR database was in the possession of plaintiff/counter-defendants, Mr. Kennedy's conduct is not deemed a *carte blanche* grant of permission to use the marks for any or all program uses, including but not limited to marketing, publishing, and licensing the ASR course for the benefit of plaintiff/counter-defendants.

8.   The limited scope of Mr. Kennedy's requests to SAC
does not lead to the implication that plaintiff/counter-
defendants could freely use the marks for their own benefit in
the face of a cease and desist letter and ongoing litigation.
See Coach House, 934 F.2d at 1558 (active representation that
defendant could use logo does not lead to the implication that
defendant had permission to do more with logo).

9.   Failing to object to a junior user's conduct is
not the equivalent of an active assurance that a senior user will
not bring a claim.  Auction Management Solutions, Inc. v. Manheim
Auctions, Inc., et al., 2008 WL 4452362, *6 (N.D. Ga. Sept. 30,
2008) (not reported) (plaintiff did not complain about
defendant's marketing practices with respect to plaintiff's
customers, but plaintiff never actively represented it would not
assert a right or claim with respect to its mark; failure to
object is not legal acquiescence).  Here, Mr. Kennedy did not
actively represent he would not assert a claim; instead, he sent
plaintiff/counter-defendants a cease and desist letter and
actively pursued litigation regarding trademark infringement.
That no follow-up cease and desist letters were sent
periodically, to object to plaintiff's/counter-defendants' varied
and ongoing use of the ASR marks, does not give rise to legal
acquiescence, especially where a claim for trademark infringement
was already being pursued.

10.   Moreover, "[w]hile a plaintiff may acquiesce in
some uses of the mark, . . . that acquiescence does not extend to
a use that has not yet materialized[.]" ProFitness, 314 F.3d at
69.  Here, the cease and desist letter notified

plaintiff/counter-defendants that they no longer had permission
to use the ASR marks.  Following the letter, Mr. Kennedy
acquiesced to use of the ASR marks in the context of keeping the
database whole and providing processing services to his paying
customers.  This limited acquiescence did not extend to
plaintiff/counter-defendants' renewed use (following the July 12,
2006 revocation of consent), which went beyond compliance with
Mr. Kennedy's requests and encompassed the type of use undertaken
before the demand letter.[7]  See also Operation Able of Greater
Boston, Inc. v. Nat'l Able Network, Inc., 646 F. Supp. 2d 166,
174 (D. Mass. 2009) (the fact that plaintiff acquiesced to
certain use does not preclude it from challenging use by
defendant that exceeds the scope of plaintiff's acquiescence);
Trans Union LLC v. Credit Research, Inc., 142 F. Supp. 2d 1029,
1041 (N.D. Ill. 2001) (same).

        11.   Mr. Kennedy's course of conduct, including the
fact that he stopped marketing the ASR program in conjunction
with SAC, and stopped forwarding student fees to SAC, suggests
that things were not "business as usual" after the dispute arose.
Instead, Mr. Kennedy's limited representations regarding
permissible use of the marks centered on preservation of the
value of the marks and the ASR program for his own future
benefit.  See Trans Union, 142 F. Supp. 2d at 1041 n.9 (a

---

        [7]  The fact that Mr. Kennedy's requests generally
maintained a cordial tone can not be deemed as an active
representation that he would abandon his trademark infringement
claim.  Mr. Kennedy apparently had no personal issues with Mr.
Mitchell and Ms. Eree and maintained a positive tone in his notes
to them, notwithstanding the ongoing dispute with Mr. Swanepoel,
RealtyU, and SAC.

trademark owner's use of its own marks does not prove that it acquiesced to defendant's use of the marks).

12.   A trademark owner's decision to maintain the status quo in the eyes of customers during a pending dispute does not constitute evidence of the relinquishment of trademark rights.  Trace Minerals Research, L.C. v. Mineral Res. Int'l, Inc., 505 F. Supp. 2d 1233, 1243 (D. Utah 2007) (while dispute is ongoing, decision to acknowledge exclusive agreement to potential buyer, notwithstanding the fact that agreement was in dispute, does not constitute evidence that plaintiff gave up its rights).

13.   This is not a case in which defendants/counter-claimants actively participated in deception of the public in order to promote the belief that the junior user's goods were actually sourced by the senior user.  See Getty Petrol. Corp. v. Shore Line Oil Co., Inc., 642 F. Supp. 203, 206 (E.D.N.Y. 1986) ("where the owner of the trademark has participated by its acquiescence in deceiving the public into believing that the source of goods is that of the trademark owner, enforcement of its right . . . should be denied").  Following the demand letter, while Mr. Kennedy did not actively seek to correct public perception that the ASR program was not owned by SAC, this course of action was not to deceive the public, but to preserve the goodwill of his marks and business during the pendency of litigation

14.   Plaintiff/counter-defendants do not carry their burden to demonstrate that the scope of defendants/counter-claimants' representations convey consent for all use undertaken after July 12, 2006, nor do the representations suggest that

16

defendants/counter-claimants would forego their claim for use of the ASR marks.

15.   The absence of one of the required elements of acquiescence is sufficient to deny the equitable defense.   <u>Coach House</u>, 934 F.2d at 1558.

**B.      Delay**

16.   The period of delay is calculated from when the senior user has notice that the junior user's actions would give rise to a claim.   <u>Coach House</u>, 934 F.2d at 1558 (period of delay starts after junior user began using mark outside the scope of senior user's permitted use).

17.   When litigants have been engaged in continuous business dealings and the trademark owner impliedly encourages continued use of its trademarks over a long period of time, acquiescence may be found.   6 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, § 31:42 (4th ed. 2008) (citing cases with periods of delay ranging from eight to thirty-five years).   <u>See also</u> <u>TMT North Am., Inc. v. Magic Touch</u>, 124 F.3d 876, 885 (7th Cir. 1997) (on motion for preliminary injunction, plaintiff's conduct during negotiations and continued use of defendant as a distributor for period of three years after dispute arose "could well rise to the level of acquiescence").

18.   Where, as here, a demand letter was sent shortly after a breakdown in the parties' business relationship, dueling complaints were immediately filed in this district and the Northern District of Georgia, and defendants/counter-claimants asserted trademark infringement counterclaims simultaneous with answering plaintiff's complaint, the Court does not find this

1    period of delay, if any, unreasonable.  <u>See</u> <u>Coach House</u>, 934 F.2d

2    at 1558-59 (period of delay just over one year "not unreasonable

3    and certainly not inexcusable under the circumstances").

4    **C.          Reliance/Undue Prejudice**

5          19.  "[P]rejudice in the context of acquiescence

6    inherently must involve reliance on the senior user's affirmative

7    act or deed, and such reliance must be reasonable."  <u>Seller</u>

8    <u>Agency</u>, 621 F.3d at 990.  "When inquiring into the reasonableness

9    of reliance, a district court must examine both the context of

10   the affirmative act and the context in which that act was

11   performed."  <u>Id.</u>

12         20.  Actively encouraging a junior user to use mark for

13   a long period of time may lead to a finding of prejudice where

14   the junior user acts in reliance on such encouragement and builds

15   up a business around the mark.  <u>Ambrosia Chocolate Co. v.</u>

16   <u>Ambrosia Cake Bakery, Inc.</u>, 165 F.2d 693, 695 (4th Cir. 1947)

17   ("active encouragement and commercial urging by plaintiff to

18   induce defendant to make and vend its cakes under the name

19   'Ambrosia'" resulted in finding of acquiescence).  <u>See also</u>

20   <u>Ironclad, L.P. v. Poly-Am., Inc.</u>, 2000 WL 1400762, *13-14 (N.D.

21   Tex. July 28, 2000) (not reported) (co-participation in business

22   program and earning profits therefrom for one year before

23   objecting to program's use of mark may lead to reasonable

24   reliance that use was permissible; however, no prejudice shown

25   where no business built up around name prior to senior user

26   objecting to use of mark).

27         21.  Mr. Kennedy's representations and

28   plaintiff/counter-defendants' subsequent use of the ASR marks

took place in the context of an ongoing business dispute and
litigation.  Given the context and limited nature of the
representations, it was unreasonable for plaintiff/counter-
defendants to rely on the representations as a *carte blanche*
grant of permission to carry on with all use of the marks, just
as they had done before the demand letter.

22.  Mr. Kennedy's limited requests to process his
students do not constitute assurance that plaintiff/counter-
defendants should build their own business around infringing
activities.  Any continued use of the marks in light of the
ongoing dispute, and outside the context of Mr. Kennedy's limited
requests, was not reasonably justified.  Because the resulting
reliance was not reasonable, there can be no prejudice.  <u>Seller
Agency</u>, 621 F.3d at 990.

23.  Under the Lanham Act, the prevailing trademark
owner is entitled to an award of damages.  <u>See</u> 15 U.S.C. § 1117.

**D.        Equitable Considerations**

24.  The Court is mindful that acquiescence turns on
the circumstances in each case, requiring balancing the parties'
equities.  <u>ProFitness</u>, 314 F.3d at 67.

25.  Considering the complicated factual background of
this case, along with the circumstances surrounding the parties'
business dispute, including a dispute over the ASR trademarks,
the equities in this case point to a finding of no acquiescence.
As of July 2006, plaintiff/counter-defendants were put on notice
of possible infringement, both through the demand letter and the
litigation that followed.  In light of Mr. Kennedy's changed
behavior after the dispute arose, including cessation of joint

marketing activities and retention of student fees for himself, it would be inequitable to excuse plaintiff/counter-defendants' use of the ASR trademarks for the two-year period leading up to entry of judgment based solely on Mr. Kennedy's limited requests.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of defendants/counter-claimants, and rejects plaintiff/counter-defendants' affirmative defense of acquiescence. A separate order will issue regarding Phase Two briefing.

The Clerk shall serve the Court's Findings of Fact and Conclusions of Law on counsel of record for all parties in this action.

Dated:   March 30, 2011.


ALICEMARIE H. STOTLER
Alicemarie H. Stotler
U.S. District Judge

S:\AHS\3NMO\FF&CL\SellerAgencyCouncil.v.KCREE.06-679.Post-Renand.FF&CL.AHS.CJVwpd.wpd